IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 8, 2020

**RAYMOND DENTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 11-02711      Chris Craft, Judge
_____

**No. W2019-00500-CCA-R3-PC**
_____

The Petitioner, Raymond Denton, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief, seeking relief from his convictions of aggravated rape, aggravated burglary, and physical abuse of an impaired person and resulting effective ninety-year sentence. On appeal, the Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to obtain an expert to rebut the State's expert regarding penetration; failed to object to medical opinions given by the victim's granddaughter, who was not an expert; and failed to object to the prosecutors' improper closing arguments. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Robert Golder (on appeal) and Michael Working (at hearing), Memphis, Tennessee, for the appellant, Raymond Denton.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Chris Lareau, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

A Shelby County Criminal Court Jury convicted the Petitioner of aggravated rape, a Class A felony; aggravated burglary, a Class C felony; and physical abuse of an adult, a Class C felony, and the trial court sentenced him as a career offender to consecutive

sentences of sixty, fifteen, and fifteen years, respectively. See State v. Raymond Denton, No. W2012-01686-CCA-R3-CD, 2013 WL 6529333, at *1 (Tenn. Crim. App. at Jackson, Dec. 10, 2013). On direct appeal of his convictions to this court, this court gave the following account of the crimes:

> Generally, the State's proof showed that on the night of November 8, 2010, the 75-year-old victim was at her home watching television when Defendant broke into her home by kicking in her back door. Defendant demanded the victim's money. When told by the victim that she had none, Defendant told her he wanted to "f* * *" her. Defendant proceeded to sexually assault the victim for at least two hours. In the course of this, the victim was injured and as a result required hospitalization. When the nude Defendant fell asleep, the victim crawled out from underneath him, got to her telephone, and called 9-1-1. When police arrived shortly thereafter, Defendant was still on the floor asleep and was handcuffed and taken to jail. The victim was taken to a rape crisis center and from there to a hospital.
>
> As to the specific element of sexual penetration, the testimony was as follows. Memphis police officer Brandon Berry was the first officer to arrive at the scene. After the nude Defendant, who was asleep on the floor, had been handcuffed and placed into a patrol car, Officer Berry spoke with the victim. She appeared withdrawn, nervous, scared, frail, and her hair was out of place. The victim told Officer Berry that Defendant, after breaking into the house, pulled the victim from the chair in which she sat, took off her clothes and his own clothes, and began the sexual assault on the floor. She told Officer Berry that Defendant's assault went on for a long period of time, and that Defendant was choking and "smothering" her. Officer Berry testified that the victim said that Defendant tried to put his penis in her but he "couldn't get anywhere."
>
> The victim testified that she was watching television in her home late on the night of November 8, 2010. She heard Defendant burst in her locked back door. She did not know Defendant. He first demanded her money. When she told him she had no money, Defendant said he wanted the next best thing-he wanted to "f* * *."
>
> Defendant grabbed both of the victim's arms and threw her on the floor. He removed her clothing, which was her pajamas, and he removed his own clothes. She testified that Defendant began "feeling" on her privates. She specifically stated that, "after [Defendant] pulled my clothes off and threw me down on the floor, then he had sex with me." Defendant was

also choking the victim and she testified she was going "in and out" of consciousness while defendant choked her.

The victim testified that Defendant had a difficult time maintaining an erection and that he would rub his penis on her legs and her private areas when he would lose an erection. During cross-examination, the victim, 75 years old at the time of the crimes, reiterated that Defendant was trying really hard to rape her, but he was having a difficult time maintaining an erection. She clarified that at the point when she was at the rape crisis center, when she told that Defendant "tried" to rape her, she was unaware that Defendant had in fact raped her. The victim testified that she knew Defendant had raped her when she found out she "had that stuff on [my legs]." Further, during cross-examination, Defendant's attorney asked the victim, "so [Defendant] couldn't get his penis in you, could he?" The victim responded, "Yeah, he did, he would rub me."

Frazel Bennett, a registered nurse and one of the victim's granddaughters, went to the victim's home on the night of the crimes after being called by the victim at 3:19 a.m. on November 9, 2010. She found the victim sitting in her chair in a large pool of blood. The blood was from the victim's vaginal area. She and her sister took the victim to the rape crisis center. Ms. Bennett observed the examination performed on the victim by the nurse practitioner at the rape crisis center. Ms. Bennett saw a laceration on the victim's vagina "down like an episiotomy type of laceration."

Sergeant Stephen Wilkerson of the Memphis Police Department interviewed the victim on November 10, 2010. The victim told Sergeant Wilkerson that Defendant did not penetrate her, saying Defendant "couldn't get it in because it wouldn't stay hard."

Judy Pinson, a [nurse] practitioner employed at the Memphis rape crisis center for twenty-five years, testified that she performed an examination of the victim, who arrived at the rape crisis center on November 9, 2010, at 7:30 a.m. Ms. Pinson was permitted to testify at trial as an expert witness as a forensic nurse practitioner with a specialty in the field of sexual assault examinations. The victim told Ms. Pinson in general terms what had happened during the assault, including stating that Defendant had, in Ms. Pinson's words, "attempted vaginal penetration." This was written in Ms. Pinson's report. Ms. Pinson was unable to use a speculum to look inside the victim's vagina due to an attempt to do so was too painful for the victim. The

- 3 -

standard report form did not have a place for the nurse practitioner to place any expert medical related opinion.

During Ms. Pinson's examination of the external area of the victim's private areas, she saw a superficial laceration of the labia majora. Also, Ms. Pinson observed a laceration at least two inches long beginning at the posterior fourchette which extended into the perineal area, which she testified was the area between the vagina and the anus. Ms. Pinson noted that the victim was bleeding from this laceration. The significance of Ms. Pinson's observations concerning the two-inch laceration is shown in this excerpt from her direct examination by the State:

> Q. Okay. This injury that you described, not the superficial injury to - - but the laceration between her vagina or the fourchette, up into the perineum, do you have an opinion based on your education, thousands of exams that you've done, as to whether or how that injury was received, what mechanism?
>
> A. There was penetration of her vagina. We many times don't see injuries in rapes or sexual assaults. It's fairly common not to see injury. And there aren't very many things that we can say for sure come from a penetrating injury but this is one of them. Injuries to the posterior fourchette don't come from anything else except something going into the vagina.
>
> Q. Does the fact that [she] gave you a history of attempt penetration, did that in any way change your opinion about what had happened and what you saw and your conclusions?
>
> A. No. Because I don't have - - I have no knowledge of what somebody - - of what somebody's definition of penetration is. I don't know if - - I don't know what [she] thinks penetration is. I don't know if - -
>
> Q. What do you call penetration, because you called this a penetrating, something penetrated the vagina?

- 4 -

A.     Something had to have gone into the vagina to make that kind of injury.  There's no other way to get an injury like that.

Q.     And because you were not able to look inside her, do you have any opinion at all about how far the something had to go inside of her to cause the tear that was several inches?

A.     It only has to go in far enough to cause the injury and because that area which is the posterior fourchette is the first place that a penis would enter or anything would enter that went - - to go inside of her, that's why we say that that's - - that's the only way that you - - that's the only time we see that kind of injury.  It's the first - - the first plane of entry to the vagina.

Defendant did not testify or offer any other proof.

Id. at *2-4.

On direct appeal of his convictions, the Petitioner claimed only that the evidence was insufficient to support the conviction of aggravated rape because the State failed to prove the element of penetration.  Id. at *1.  This court found the evidence sufficient to support the conviction of aggravated rape, explaining,

Any intrusion into the vagina, "however slight" is sufficient to meet the statutory definition of sexual penetration, an essential element of aggravated rape.  [See Tenn. Code Ann. §§ 39-13-501(7), -502.]  The victim made some statements that Defendant attempted to rape her, and a jury could infer from that statement that no sexual penetration occurred.  On the other hand, the victim testified that she initially believed Defendant had not raped her when she was at the rape crisis center, but she clarified that she later learned that he did, in fact, rape her.  The victim testified that she was "choked" and "smothered" by Defendant during the sexual assault which she said lasted about two hours.  She testified that she passed "in and out" of consciousness.  She was bleeding from a laceration in her vaginal area.  An expert witness conclusively stated that in her opinion the laceration had to have been caused by penetration of the vagina.

All of these facts were presented to the jury. Taken in the light most favorable to the State, there is sufficient evidence of unlawful sexual penetration to sustain Defendant's conviction for aggravated rape.

Id. at *4. Accordingly, this court affirmed the Appellant's convictions. Id. at *5.

Less than one month after this court filed its opinion, the Petitioner filed a pro se petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition for post-conviction relief. Relevant to this appeal, the Petitioner alleged in the amended petition that trial counsel was ineffective because he failed to obtain an expert to rebut Judy Pinson's testimony regarding penetration; failed to object to medical opinions given by Frazel Bennett, who was not an expert; and failed to object to the prosecutors' improper closing arguments.

The post-conviction court held evidentiary hearings on May 26, 2016, December 1, 2017, and October 19, 2018. At the first hearing, trial counsel testified for the Petitioner that he began working for the public defender's office in 1998 and was appointed to the Petitioner's case. Trial counsel talked with the Petitioner in court and in jail, and they "had quite a lot of communication." An investigator assisted trial counsel, and trial counsel reviewed discovery. The sole issue was whether the Petitioner penetrated the victim, and Judy Pinson testified for the State at trial about penetration. Trial counsel said he did not consider using an expert to rebut Ms. Pinson's testimony and explained as follows:

The problem in this case is, one, there were no pictures. So what the expert - - if we were going to have an expert, the only thing they would have been reviewing is the notes of the Rape Crisis nurse and her drawings.

And then the other problem is that the requirement for the State to prove penetration in a rape case is so small that having an expert to discuss whether penetration occurred at all can be very much a double-edged sword because on cross-examination the [question] can be asked, "Well could penetration have occurred and left nothing?" And, frequently, penetration leaves no evidence of penetration because the requirement is so minimal that it doesn't require much.

Trial counsel testified that the perpetrator's identity was not an issue and acknowledged that the facts of this case were "difficult." He noted that the Petitioner "was arrested face down on her floor" and "was only wearing one sock when he was arrested." Trial counsel stated that he "vaguely" remembered reviewing the Rape Crisis Center report with Ms. Pinson and that he thought he briefly discussed the case with Mark Alston, an

- 6 -

attorney in the public defender's office who also was a nurse. Trial counsel said Ms. Pinson's drawing "showed some scratches" in the victim's vaginal area. There also was testimony about blood in the victim's vaginal area. Trial counsel said that he reviewed the medical evidence before trial and that he concluded "an expert wasn't going to help" the defense.

Trial counsel acknowledged that Frazel Bennett was present during the victim's forensic examination. Trial counsel also acknowledged that Ms. Bennett was a nurse and that she testified at trial about her "personal observations" during the examination. Trial counsel said he did not object to Ms. Bennett's testimony because she was an "eyewitness" and because "I don't know what my objection would have been at that point." Trial counsel did not think Ms. Bennett's testimony "really expanded things" against the Petitioner.

Trial counsel testified that the defense's theory was lack of penetration. He said he considered that theory "problematic," though, because the State had some proof of penetration and because the evidence the State needed to prove penetration was "almost nothing." Trial counsel stated, "[I]f someone spends three hours trying to rape somebody, even with a flaccid penis, penetration pretty much has occurred multiple times." Trial counsel said that although the victim claimed the Petitioner "attempted" to penetrate her, "we know that what a lay person says about attempted rape, from a legal perspective, often is rape." Nevertheless, trial counsel hoped the jury "would rely on what the victim actually said."

Trial counsel testified that during the State's closing argument, the prosecutor was "a little angry" but was "calm." In trial counsel's closing argument, he "went back point-by-point through all the times [the medical records] said attempted rape, everywhere it said attempted rape, and tried to focus on that instead of the actual medical proof." Trial counsel tried to be "very dispassionate" in his closing argument and tried to "take all the anger and hate out of it that might have been direct towards [the Petitioner]." After defense counsel's closing argument, the second prosecutor "hopped up" and was "very aggressive and very angry" in her rebuttal closing argument. Trial counsel said that the second prosecutor was reacting to what trial counsel had argued and that the second prosecutor "played into [trial counsel's] hands" by being angry. However, at some point, the second prosecutor was "kind of getting in [the Petitioner's] face," and the Petitioner looked "very, very angry." Trial counsel thought the second prosecutor was "making the courtroom unsafe," so trial counsel asked to approach the bench and advised the trial court that he thought the Petitioner was going attack one of the prosecutors. Trial counsel said that some of the prosecutors' statements were objectionable and that the prosecutors "probably" expressed personal opinion of the Petitioner's guilt. Trial counsel did not object, though, because he thought the second prosecutor's demeanor helped the defense and helped trial counsel's

strategy. Trial counsel hoped the second prosecutor's anger would cause the jury to think about trial counsel's closing argument and "take a calm, reasoned approach."

On cross-examination, trial counsel testified that he graduated from law school in 1992 and began practicing civil law. Trial counsel's first criminal trial occurred in 1999, and the Petitioner's trial was in April 2012. Trial counsel said that this case was "the most factually difficult case" he had ever tried, noting that the Petitioner removed the victim's Depends undergarment during the incident.

Trial counsel testified that even if a defense expert had testified at trial that there was no physical proof of penetration, he did not think the expert would have been helpful. Trial counsel clarified that the victim's injuries were "tears," not "scratches." He said that he did not object to Ms. Bennett's testimony because he thought she was testifying about her observations. Trial counsel also "didn't want to get too much into challenging" Ms. Bennett, who was the victim's granddaughter, because he did not want to anger the jury. Trial counsel said he did not think Ms. Bennett's testimony hurt the defense "that much" because Ms. Bennett "was testifying as to what she saw."

Trial counsel acknowledged that at the time of the Petitioner's trial, he was "intimately familiar" with the victim's medical records. He also acknowledged that during his closing argument, he pointed out to the jury that the victim's medical records said "attempted penetration" or "no penetration" eight times. Specifically, trial counsel argued to the jury, "'So let's count them. One, two, three, four, five, six, seven, eight incidents, attempted penetration, no penetration, no vaginal rape.'"

At the second evidentiary hearing, Cari Caruso testified for the Petitioner as an expert in sexual assault examination that she was "a board certified sexual assault nurse examiner" whereas Judy Pinson was a nurse practitioner and was not board certified in sexual assault.[1] Ms. Caruso said that she had performed thousands of sexual assault examinations but that she had never worked in Tennessee or performed an examination in Tennessee.

Ms. Caruso testified that she reviewed Ms. Pinson's report regarding the victim's forensic examination and Ms. Pinson's trial testimony. Ms. Caruso said that it was "standard procedure" to take photographs during an examination but that Ms. Pinson did not take any photographs. Ms. Caruso stated that she also had "some issues" with Ms. Pinson's report. First, Ms. Pinson wrote in her report that a laceration was on the victim's posterior fourchette and that the laceration was "several inches in length." Ms. Caruso

---

[1] In the post-conviction court's order denying post-conviction relief, the court noted that Caruso testified via Skype.

explained that the posterior fourchette was considered part of a woman's external genitalia and that the length of the posterior fourchette was about one inch; therefore, the victim's injury could not have been several inches in length. The second issue Ms. Caruso had with Ms. Pinson's report was that Ms. Pinson described "vaginal bleeding." However, Ms. Pinson did not quantify the amount of blood, so Ms. Caruso could not determine whether the victim actually experienced bleeding from her vagina. Ms. Caruso noted that vaginal tears sometimes required extensive treatment such as surgery but that the victim did not need surgery. Ms. Caruso said Ms. Pinson should have been more specific about the bleeding and should have photographed the bleeding. Ms. Caruso stated that she was not saying the victim did not experience vaginal bleeding but that she did not have enough information to make that determination.

Ms. Caruso explained that as a woman aged, her anogenital area became less flexible and more vulnerable to injury by sexual contact or by general contact such as rubbing with a washcloth. Therefore, the elderly victim could have been "quite easily injured" during her encounter with the Petitioner. Ms. Caruso said that in her opinion, photographs were "absolutely critical" in a sexual assault examination. She said, though, that even if Ms. Pinson had taken photographs in this case, she would have been unable to determine from the photographs whether the Petitioner penetrated the victim because penetration did not always result in "findings" during an examination. Ms. Caruso stated that penetration "very well could have occurred" in this case but that "I just can't say one way or the other."

Judy Pinson testified for the Appellant that she had listened to Ms. Caruso's testimony. Ms. Pinson acknowledged that Ms. Caruso was correct in that the injury to the victim's posterior fourchette could not have been several inches in length. Ms. Pinson said that she "misstated" the length at trial and that she "threw out inches when it's not." Ms. Pinson stated that the victim was "very reluctant to have an exam" and that the victim "seemed to be very embarrassed by the whole situation." Therefore, Ms. Pinson decided not to take photographs during the victim's examination. Ms. Pinson said the "vaginal bleeding" in her report came from the victim's "history." When Ms. Pinson wrote "vaginal bleeding" in her report, she did not know from where the victim was bleeding. During the victim's examination, Ms. Pinson saw that the victim was bleeding from her posterior fourchette. Ms. Pinson acknowledged that the victim's injury was an external injury. On cross-examination, Ms. Pinson agreed with Ms. Caruso's testimony that photographs would not have helped determine whether penetration occurred in this case.

At the third evidentiary hearing, the Petitioner testified that he met with trial counsel when the Petitioner came to court. Trial counsel met with the Petitioner one time in jail right before the Petitioner went to trial. The Petitioner said that trial counsel never discussed obtaining an expert and that a defense expert could have contradicted the State's

expert regarding penetration. The Petitioner said that if trial counsel had hired a defense expert, the outcome of his trial may have been different. The Petitioner used his own prison money to hire Ms. Caruso to testify as an expert at the evidentiary hearing.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's claim that trial counsel was ineffective for failing to have a defense expert rebut Judy Pinson's testimony, the post-conviction court found that a defense expert would not have changed the outcome of the Petitioner's trial because Cari Caruso testified that even if Ms. Pinson had taken photographs during the victim's forensic examination, Ms. Caruso would not have been able to determine from the photographs whether penetration occurred. As to the Petitioner's claim that trial counsel was ineffective for failing to object to Frazel Bennett's testimony, the post-conviction court found that although Ms. Bennett was never qualified as an expert witness, Ms. Bennett was not asked to give an expert opinion and properly testified as a lay witness.

Finally, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to object to the prosecutor's rebuttal closing argument. The post-conviction court stated that the prosecutor's rebuttal argument was "extremely emotional, loud and passionate" and that she was "yelling and pointing at the petitioner." The post-conviction court noted that during the argument, trial counsel asked to approach the bench because he was concerned the Petitioner was going to attack the prosecutor. Nevertheless, the post-conviction court accredited trial counsel's testimony that he did not object to the prosecutor's argument because her demeanor and anger were part of trial counsel's trial strategy. The post-conviction court explained as follows:

> In a careful reading of [trial counsel's] closing argument, he appeared to pursue this theory to the letter. . . . [Trial counsel stated,] "It's not about yelling and screaming and getting revenge for [the victim]." He explained that was not their job, and discussed the facts casting reasonable doubt on his guilt of some of the elements. It is entirely understandable that when [the prosecutor] began [the prosecutor's] rebuttal with yelling and screaming in anger that he did not object, as [the prosecutor] was proving his point, reminding them that he was trusting the jury to remain dispassionate when doing its job, as it could not trust the State to be dispassionate.

> This court distinctly remembers this particular closing argument, as this was one of the most hopeless cases this court has tried in over 40 years as a defense attorney, prosecutor or judge, and this court was very curious as to whether the defense attorney would be able to find anything to say that would be of benefit to the petitioner. His closing argument was exceptional, in this court's opinion, and the State's loud, angry rebuttal argument did seem

to play right into the hands of the defense. However, it was not enough to overcome the testimony of the victim and the facts of the case, which were extremely powerful.

The post-conviction court stated that trial counsel's decision not to object was "sound trial strategy" and that the post-conviction court would not second-guess that strategy. Accordingly, the post-conviction court denied the petition for post-conviction relief.

## II. Analysis

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to obtain an expert to rebut Ms. Pinson's expert testimony regarding penetration; failed to object to medical opinions given by Ms. Bennett, who was not an expert; and failed to object to the prosecutors' improper closing arguments. The State argues that the Petitioner has failed to show that he received the ineffective assistance of counsel. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was

below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner claims that trial counsel was ineffective because Cari Caruso's expert testimony would have been "crucial" to his defense. Specifically, the Petitioner contends that Ms. Caruso "would have leveled the playing field by calling out" Ms. Pinson for not taking photographs during the victim's forensic examination and that Ms. Caruso "would have raised suspicion" about Ms. Pinson's measurement of the laceration on the victim's posterior fourchette. He also contends that Ms. Caruso would have emphasized to the jury that the laceration was external and could have been caused by actions other than sexual contact.

The post-conviction court concluded that Ms. Caruso's testimony would not have changed the outcome of trial. We agree with the post-conviction court. Ms. Caruso stated that she could not say the Petitioner did not penetrate the victim. She also stated that although Ms. Pinson should have taken photographs during the victim's examination, she would have been unable to determine from the photographs whether penetration occurred. At trial, Ms. Pinson testified that she observed the laceration to the victim's posterior fourchette during her external examination of the victim and that the injury could not have been caused by anything but penetration of the victim's vagina. Although the victim reported to the police and Ms. Pinson that the Petitioner tried to penetrate her, even trial counsel was of the opinion that over the course of the Petitioner's hours-long attack of the victim, penetration had to have occurred. Therefore, we conclude that even if trial counsel was deficient for not presenting Ms. Caruso at trial, the Petitioner has failed to demonstrate that he was prejudiced by the deficiency.

Next, the Petitioner claims that trial counsel was ineffective for failing to object to Ms. Bennett's testimony. He contends that Ms. Bennett's testimony "transcend[ed] to realm of ordinary experience, and invaded the province of the jury" because she testified about the nature, source, and cause of the victim's bleeding; used medical terms such as

- 12 -

"episiotomy"; and testified about the victim's other injuries, such as her heart condition, which probably existed before the attack.

At the evidentiary hearing, trial counsel testified that he did not object to Ms. Bennett's testimony because she was an eyewitness to the victim's examination and did not give an expert opinion. The post-conviction court found that the Petitioner was not entitled to relief, explaining,

> The prosecutor made a point in her questions of stating she would not ask Ms. Bennett for an expert opinion and didn't. Ms. Bennett testified that the victim went to the hospital for three weeks because of her bruising and heart attack symptoms, and then started "throwing blood clots," so that eventually her health deteriorated to such an extent that she was sent to a nursing home and never again was able to go back to her home with help as she had been doing. Ms. Bennett was never qualified as an expert and was never asked to give an expert opinion. As a lay witness, her testimony was correctly "limited to those opinion or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue" pursuant to Tenn. R. Evid. 701(a). This allegation has no merit.

The Petitioner has not cited to any portion of the trial transcript in which Ms. Bennett allegedly gave expert opinion testimony and has not provided this court with any examples of such testimony. Ms. Bennett, who was the victim's granddaughter and a registered nurse, personally witnessed the victim's forensic examination and could describe what she saw during the examination. Moreover, we do not think her use of common medical terms, such as "episiotomy," elevated her testimony to that of a medical expert. Therefore, we conclude that the Petitioner is not entitled to relief.

Finally, the Petitioner contends that trial counsel was ineffective for failing to object to the prosecutors' closing arguments. We note that at the evidentiary hearing, post-conviction counsel focused on the State's rebuttal closing argument, and the post-conviction court only addressed that portion of the argument in its written order. See Tenn. R. App. P. 36(a). Trial counsel testified that not objecting to the second prosecutor's aggressive and angry demeanor was part of his trial strategy in that he was hoping her demeanor would cause the jury to "take a calm, reasoned approach" to his own closing argument. The post-conviction court accredited trial counsel's testimony. Moreover, the post-conviction court found that the trial transcript supported trial counsel's testimony and refused to second-guess trial counsel's strategy. Likewise, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v.

- 13 -

Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Accordingly, the Petitioner has failed to demonstrate that he is entitled to relief.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE